[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has appealed, claiming that she is aggrieved, and has asked for review of the statement of compensation filed by the defendant for the taking by eminent domain of certain easements and rights over portions of her property, all as shown on a map entitled: "TOWN OF MANCHESTER CONNECTICUT ACQUIRED FROM ADELL F. KATKAUSKAS BY THE TOWN OF MANCHESTER, CONNECTICUT." The map refers to Proj. No. 76-152, is drawn to a scale of 1" = 40' and is dated 6/89. A certified copy of the map revised to March 27, 1990, was introduced into evidence by agreement as Exhibit C. A description of the taking is attached to the complaint.
The parties agreed that the date of the taking was November 20, 1990, and that the defendant filed on that date a statement of compensation fixing damages at $3,500.
The subject property is situated on the southerly side of the Tolland Turnpike in the Town of Manchester. Manchester is to the east of Hartford and on the east side of the Connecticut River. It is primarily residential in character but has seen more commercial development in recent years. It is easily reached from major highways and has convenient access to Hartford.
The subject property lies in the northwesterly part of Manchester to the south of Interstate Route 84. Tolland Turnpike runs easterly from East Hartford and joins Route 30 and 83. At the intersection of Tolland Turnpike and Buckland Street to the west of the subject property is situated the Buckland Hills shopping mall, a very large commercial development. Tolland Turnpike is in one of the residential zones for the most part, although it has some business development at its easterly and westerly ends. CT Page 4549
The subject property consists of a 6.01 acre parcel of land with 690 feet, more or less, of frontage on Tolland Turnpike. It is in the Rural Residence zone and is improved with an older two storey single-family dwelling, an asphalt driveway, a two car garage and a barn. The improvements are on the northeastern portion of the property which slopes downwards from north to south. The remains of a stone wall ran along a bank in front of the subject property. It was partly on the subject property and partly in the right of way. There were wetlands on the westerly and southerly portions of the property. There are lawns and shrubs around the dwelling house and open land and trees on the rest of the property. The subject property has its own well and septic system and has public electricity and telephone service. In addition, public water and sanitations systems are available.
The defendant took a portion of the subject property for construction of highway improvements. The taking consisted of an easement within an area of 0.035 of an acre, more or less, for the support of the highway and for the safety of the highway, and to remove, use or retain excavated material; a right to construct a driveway within an area of 0.001 of an acre, more or less; a drainage right of way over an area of 0.005 of an acre, more or less; and a right to construct a sedimentation control system along the slope easement.
The plaintiff testified as a witness on her own behalf. She said that four mature trees, a barberry hedge, the stone wall and the bank had been removed during construction. She testified that the slope had changed and that water now runs onto her property and has damaged her lawn. She also said that the vinyl siding on her house which had been installed in about 1980 at a cost of $7,000 had been stained by dust during construction. She described fresh water streams and standing water in the wetlands which she said had increased since construction. She said that the culvert and ditch which existed before the taking was obstructed before the taking so that water did not run through it from the north side of the road.
Frank Katkauskas, plaintiff's nephew, was called CT Page 4550 as a witness who was familiar with the subject property. He testified that he never saw water flow through the culvert which existed before the taking. However, he had taken a videotape recording of portions of the property in early November of 1990 before the taking to show retention of water on the property. The videocassette was introduced into evidence as Exhibit M. During the recording, he said that water runs onto the subject property through the culvert. The tape shows large areas of standing water which he said resulted after a berm was constructed in connection with a sewer line to the west of and off the subject property. This berm had the effect of damming water and impeding its flow beyond the berm.
The plaintiff also called John Moran, an arborist, as a witness. Moran said that he had looked at the stumps of four trees and gave an opinion as to the replacement value of those trees. He also opined that two other trees near the road would decline.
The plaintiff called Roger Nemergut, a registered professional engineer, as an expert witness. He said that the plaintiff had employed him to evaluate the effect on the subject property of the widening of the Tolland Turnpike and especially storm water run-off. In a letter to the plaintiff introduced as Exhibit G, Nemergut wrote that the specific problem, as he understood it, was an increase in the wet areas on the subject property. He inspected the property on May 22, 1991. The undeveloped land to the south was substantially wetland and there was standing water on that date. He opined that earth which had been placed across a sanitary sewer trunk line in 1988 or 1989 to the west of the subject property was a berm across the wetland and a barrier to the flow of water. He opined that the old existing culvert discharged water to a drainage ditch and onto the subject property. Because it was crushed and silted, the flow of water through it would be impeded and reduced in rate but not in volume. He testified that widening the Tolland Turnpike would affect the amount of run-off to the extent that pavement replaced soil. He said that the rate of flow through the new culvert would be faster so that at any given time the volume of water at a given location would be CT Page 4551 increased. He relied upon findings made by DeCarlo 
Doll, Inc., for calculations of run-off. A report from DeCarlo Doll, Inc., signed by Michael J. Turner, manager of engineering, and dated May 15, 1991, was introduced into evidence as Exhibit F. Turner wrote in his report that he and Robert Weaver had inspected the property and received plans and drainage calculations obtained from the defendant's engineering department. The report made several findings, including the following: no significant drainage area is being directed to the pipe which discharges onto the property; reasonable assumptions and sound engineering practices were exercised in determining time of concentrations, intensities, drainage areas, run-off co-efficients, run-off quantities and proposed pipe sizes; review of the Town Wetland Map and road construction plans indicate that as much as three-quarters of the yard where the plaintiff was concerned about potential flooding is delineated as "wetlands;" as no expansion of drainage limits is proposed, it can be assumed that any increase in run-off would result from increasing the pavement width from 26 feet to 32 feet which would increase drainage approximately 2.5%; in terms of actual quantity, the proposed discharge from a 25 year storm of 11.93 cubic feet per second compares to approximately 11.63 cubic feet per second, an increase of about 0.3 cubic feet per second, a negligible increase; to evaluate potential impact of such a small increase, the flow was compared to the 6 acre, more or less, swampy area on the Katkauskas property and other property to the south and it was concluded that if all the water were retained during a 25 year storm, with no outlet discharge from the property, which was not the case, water level would rise about 1 1/4 inches and horizontal limits of flooding would expand less than three feet; the net impact to the property of the proposed improvements should be negligible. Nemergut relied upon the DeCarlo Doll, Inc., report for the amount of run-off but he disagreed with the conclusion that the impact was negligible. He opined that the berm to the west of the subject property raised the water level on the subject property. He assumed that development which had taken place in upper reaches of the watershed increased run-off and that it would not be inconsistent to have seen additional wet areas. It was his opinion CT Page 4552 that while a 2.5% increase in run-off might not be significant ordinarily, any increase is objectionable where the property is flat and where concern already exists because of increase due to previous construction. He also opined that the full impact of road drainage would be felt after the partially plugged pipe was replaced. He concluded that because of the berm, only one acre of swamp or wetlands was available, rather than six acres, to absorb the flow of water, and that therefore in a 25 year storm horizontal limits of flooding would expand 18 feet. This would result in an increase of 0.6 of an acre flooded.
M. Elliot Scheiman, a qualified real estate appraiser, was called by the plaintiff as an expert witness. Scheiman opined that the subject property could be rezoned from RR to RB. In that event, frontage requirements would change from 150 feet to 75 feet and minimum lot size from 30,000 square feet to 9,000 square feet. He opined that the highest and best use for the subject property would be achieved through a subdivision in accordance with town regulations. He used comparable sales to evaluate the land as acreage and he believed that continued use of the dwelling would be contingent upon a plan of development. Three of the comparable sales were in or partially in the RR zone at the time of the sales, but two were changed to the RB zone after the sale. One was changed to the PRD zone after the sale and a fourth was in the RB zone at the time of the sale. Scheiman made no adjustment for the difference in zones. The sales took place between 1987 and 1988 and he did not think any adjustment for time was necessary. He concluded that one acre was in wetlands before the take and estimated the fair market value of the land before the take at $90,000 per acre for 5.01 acres and $5,000 for the acre of wetlands. He estimated total before taking value at $455,000. He estimated that the front foot per square foot price would be $7.00 per square foot. Sheiman accepted Nemergut's conclusion that an increased water flow would reduce the useable land area. He concluded that the subject would be diminished by the easement to slope and the drainage right of way and treated those easements as if the fee had been taken because he believed that the area was of no value to the plaintiff. In addition, he considered that the wetlands CT Page 4553 area had been increased by 0.6 of an acre and the remaining land reduced in area by that amount. Using the same per acre values as before, he concluded that the fair market value of the subject property after the take was $401,725. He did not believe that the value of the dwelling was affected by the taking and he did not estimate any damages for the loss of trees or the stone wall. Scheiman estimated damages from the taking to be $53,275.
The defendant called James Weber, an engineer employed in its engineering division. Weber described the widening of Tolland Turnpike as a state funded reconstruction project to upgrade the highway. He said that a survey introduced into evidence as Exhibit E showed the property line along the stone wall and that the taking map, Exhibit C, showed the apparent street line in the stone wall. He described the watershed area draining toward the subject property and explained that the drainage systems installed in a development at a higher elevation had reduced the watershed area by about eight acres. The drainage system diverting water was in place on November 1, 1990. Weber testified that the developments in the upper part of the watershed do not discharge onto the subject property. He opined that there would be a minor increase in run-off because of the widening of Tolland Turnpike, but that the total run-off would be less overall than it would have been before development in the upper watershed because of the run-off which had been eliminated. He opined that Nemergut's conclusion that in a 25 year storm the horizontal limits of flooding would expand 18 feet was faulty because it assumes a flat one acre parcel. He testified that construction of the slope easement and drainage right of way began in April of 1991. He said that he had seen water flowing through the culvert and ponding on the street before the take. Weber opined that the trees which were removed were on public property.
The defendant called Richard H. Barry, a qualified appraiser, as an expert witness. Barry concluded that there would be no loss in value to the dwelling house because of the taking. He opined that the highest and best use of the subject property CT Page 4554 both before and after the take is for continuation of its present use as a single family dwelling on the easterly portion of the property and residential development of the remainder consistent with existing zoning and uses in the neighborhood. He opined that because of the wetlands there would be a maximum development of two additional residential lots westerly of the existing dwelling fronting on Tolland Turnpike. Because he concluded that any effect of the taking would be on land as developed, Barry assumed the probability of a three lot subdivision. For valuation purposes in order to estimate the effect of the taking, Barry valued only the frontage for a depth of 25 feet, a total of 17,250 square feet. He used the sales comparison method in his approach to value and located three residential building lots which he used as comparable sales. He concluded that the frontage of the subject property had a value of $7.00 per square foot and that the fair market value of the 17,250 square feet of frontage before the take was $120,750. He assigned an "X" value to the remainder of the property. Barry opined that the overall effect of the take is minimal. He used the same method of valuation after the take as he had used before. He reduced the value of the 1,525 square feet in the slope easement by 25% and the value of the 218 square feet in the drainage right of way by 50%. Barry estimated that the fair market value of the frontage after the taking was $117,250 plus "X" and estimated damages sustained as $3,500.
No evidence was adduced to show that at any time any attempt had been made to change the zone of the subject property from RR to RB or to any other zone. No attempt was shown to have been made to develop the property or to obtain subdivision approval. The property contains a substantial area of wetlands which existed before the easements were taken. No attempts have ever been made to obtain any of the approvals and permits which would be required from zoning and inland wetlands authorities in order to develop any portion of the subject property. It seems possible, in light of other development in the area, that subdivision might occur in the future under more favorable economic circumstances. It would be entirely speculative to assume that a zone change might occur in the absence of CT Page 4555 any application up to now or any attempt to delineate the wetlands or to obtain any of the necessary approvals. The berm to the west of the subject property was in place before the taking and was not a part of the taking. The observations by the plaintiff and her nephew were that the amount of standing water on her property had increased since construction of the berm. The increase in run-off due to widening of Tolland Turnpike amounts to only 0.3 cubic feet per second in an 25 year storm, which I have concluded is a negligible increase in amount. The fact that a new culvert replaces an old one which was obstructed affects only the rate and not the volume of flow through the pipe. I do not find that the property remaining after the taking has been reduced in value by additional run-off and I find no severance damage to the remaining property as a result of any negligible increase in run-off.
The dwelling house on the subject property has vinyl siding which was installed at a cost of $7,000 at some time in 1980 or 1981. The house and garage were stained a pink shade during the construction on Tolland Turnpike, but it was not clear from the testimony whether the staining occurred due to the widening of the highway or to the construction of the slope easement or one of the other easements taken. The contractor had the siding washed, but the plaintiff says that it did not come off some parts of the house or the garage. She offered testimony on the cost of new siding, but there was no evidence showing the value of the siding at the time of the taking. Even if it could be shown that the siding was damaged by proper construction work on the easements and that the discoloring was a necessary, natural and proximate result of the taking, damages for the discoloration cannot be determined in the absence of evidence of the value of the siding at the time of the taking and thereafter. Furthermore, there was no evidence tending to show that the discoloration was a necessary, natural and proximate result of proper construction activities on the easements.
As a result of construction of the slope easement, four trees, a barberry hedge and the remains of an old stone wall were removed. There was a dispute in the evidence as to whether the remains of the CT Page 4556 stone wall and the hedge and the trees were on the plaintiff's property. I have concluded that the hedge and parts of the stone wall were on the plaintiff's property. The survey introduced as Exhibit E shows the front property line running generally along the wall with the parts of the wall on each side of the line. The pictures introduced as Exhibits 8 and 9 show trees which seem to be north of the line of the wall. These same pictures show that only vestiges of the stone wall remained before the take, however. The loss of the hedge and the vestiges of the stone wall had a minimal impact upon the value of the remaining property.
It is the duty of a referee sitting in condemnation cases to make an independent determination of value and fair compensation in the light of all of the circumstances, the evidence, his general knowledge and his viewing of the premises. After viewing the property, and having given due consideration to the testimony of all of the witnesses and to all of the evidence, and to my own knowledge of the elements establishing value, I conclude that the damages sustained by the plaintiff are $7,100. Judgment may enter for the plaintiff to recover the sum of $3,600 in addition to the $3,500 already paid, with interest on said further sum from the date of taking to the date of payment, together with costs and an allowance of $600 towards her appraisal fees.
George D. Stoughton State Trial Referee